# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

MEREDITH L. MCLARTY,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

**No. 08-CV-4011-DEO**

**MEMORANDUM OPINION AND ORDER**

_____

## I. INTRODUCTION AND BACKGROUND

Plaintiff, Meredith L. McLarty, (hereinafter "McLarty"), filed this action seeking review of the Commissioner's decision that she is not disabled under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. (the "Act.") Tr. 66-68. This Court has authority to review a final decision by the Commissioner under 42 U.S.C. § 405(g).

McLarty claims she is disabled because of depression, borderline intellectual functioning, epilepsy, and a learning disability.[1] McLarty alleges a disability onset date of December 1, 2001, which represents the last day she was

---

[1] McLarty's epilepsy is now controlled with medication, so that impairment is no longer an issue in determining whether McLarty is disabled under the Act.

employed.  Tr. 66.  According to the ALJ, McLarty's earnings record shows that she remained insured through September 30, 2004.  Tr. 22.  Thus, McLarty has the burden to establish disability by that date.

As a preliminary matter, the record in this case contains medical evidence of McLarty's impairments both prior and subsequent to her date last insured.  While this Court has not considered any evidence subsequent to McLarty's date last insured as a basis to establish whether McLarty was disabled, this evidence is nevertheless relevant and may be considered to get a clear understanding of the severity of her condition prior to the expiration of her insured status.  See Parsons v. Heckler, 739 F.2d 1334, 1340 (8th Cir. 1984); Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  This evidence is especially relevant to understand the severity of McLarty's depression and anxiety conditions, for which she did not seek medical treatment until April 15, 2004.

**A.  Social and Work History**

McLarty was born on June 21, 1978, and is now 30 years old.  She underwent cognitive testing in elementary school, was classified as learning disabled, and enrolled in special

education classes through high school. Tr. 193-232. She obtained her high school diploma in 1997, graduating with a 1.69 Grade Point Average ("GPA").[2] Tr. 71. McLarty subsequently attended classes at Western Iowa Technical Community College for several semesters. Tr. 70. Western Iowa Tech records show that McLarty's cumulative GPA was 1.42.[3] Tr. 70. She has never had a driver's license or learned how to drive, and she lives at home with her parents. McLarty testified that she spent a couple hours a week writing short stories and poetry, and probably six or seven hours a day playing poker, solitaire, and other games on the internet. Tr. 406, 407.

McLarty has past relevant work experience as a cashier/checker, fast food worker, and child day care center worker; however, the record reflects a history of failed attempts at maintaining such employment. Tr. 136, 342-43. McLarty worked at Wal-Mart for five months and walked out on the job because she refused to take off her hat. Tr. 342.

---

[2] A 1.69 GPA represents a C-. http://www.witcc.edu/pdf/catalog.pdf, visited May 20, 2009.

[3] A 1.42 GPA represents a D+. http://www.witcc.edu/pdf/catalog.pdf, visited May 20, 2009.

She was asked to leave her job at a day care center after two months because she could not control the three and four year olds for whom she was responsible. Tr. 342. Vocational Rehabilitative Services found McLarty a job at Comfort Inn making beds. Tr. 342. She was eventually made a housekeeper, but she lost her job after having an anxiety attack while trying to clean a bathroom. Tr. 342. McLarty worked at Hardee's as a cashier for approximately two years. Tr. 107. She received help from the managers, but was often teased by younger employees. As a result, McLarty would hide in her closet and kick her bedroom wall to avoid having to go to work. Tr. 342. She eventually left that job because her boyfriend talked her into leaving. McLarty later returned to work for Wal-Mart, but was fired after she failed to show up because her boyfriend asked her not to go. Tr. 343.

The record also shows that McLarty has failed to obtain further employment after numerous attempts. For example, she attempted to complete an application for Wal-Mart, but walked out after having an anxiety attack. Tr. 343. McLarty's parents stated that she similarly had not had the courage to go in and obtain applications and, if she did, would not fill

them out or return them.  Tr. 343.  McLarty's parents stated that "[t]he only reason she was able to keep the jobs she had was because we made sure her clothes were clean and that she bathed.  We got her up in the morning, made her breakfast and got her to work on time."  Tr. 343.

At the ALJ hearing on October 10, 2006, McLarty testified that she had not worked since Cub Foods fired her because she was feeling really down about herself and because she didn't feel confident enough to be able to work.  Tr. 404.  The ALJ asked McLarty if she was not working because she was trying to get on disability, to which McLarty answered yes.  Tr. 404. The ALJ then asked McLarty whether somebody told her not to work because it would hurt her chances for disability, and McLarty said that her representative, Mr. Sturgeon, told her so.[4]  Tr. 405.

McLarty then testified that if she was not applying for disability and needed money, she would make an effort to get a job and that she wanted to be a writer.  Tr. 405.  The ALJ

---

[4] Mr. Sturgeon and the ALJ later clarified with McLarty that she learned from a judge at a prior hearing and application for disability that her chances for receiving disability benefits were less if she was working.  Tr. 410-13.

asked McLarty why she could not return to a job similar to Hardee's or her other jobs. Tr. 410. McLarty answered that she could not handle herself in those kinds of situations, that she would get too anxious, and that it was hard to take orders and deal with other employees and managers sometimes. Tr. 410. The following testimony then occurred:

> ALJ: Do you think you would do better in a job if you didn't have to have a lot of social contacts?
>
> McLarty: Exactly, yes.
>
> ALJ: What about something like cleaning or doing jobs where you work with your hands rather than having to associate with other people?
>
> McLarty: Probably, yeah. Tr. 410.

With regard to McLarty's inability to work, McLarty stated that she would get stressed out, have panic attacks, and would start crying. Tr. 416. McLarty stated that she had difficulty concentrating for a period of time when playing games on the internet, and that she also had problems concentrating during work. Tr. 416, 417.

**B. Medical History**

McLarty has suffered from epilepsy, depression, anxiety, and a learning disability for much of her life. McLarty's

epilepsy condition caused her three grand mal seizures at ages four, five, and ten. Tr. 187. She did not have any grand mal seizures since age 10, although she experienced daily petit mal seizures, which lasted a few seconds each. Tr. 187. McLarty now takes medication to control the epilepsy condition. Tr. 187.

### 1. Treating Physician - Dr. Richard Andrews

McLarty has seen Dr. Richard Andrews, a neurologist, annually since 1998 for her seizure condition and cognitive disorder. Tr. 237-245, 356-385. The record shows that Dr. Andrews discussed McLarty's condition relating to her disability on many occasions. On March 3, 2000, Andrews noted that McLarty was unlikely to ever function independently because of her cognitive defect. Tr. 241. Andrews stated, "[h]er mental impairment, both in terms of her mental status (mood primarily) coupled with her cognitive disability and her personality immaturity really should qualify her for a disability claim." Tr. 241. He further stated that McLarty had lots of ups and downs and got demonstrably depressed and irritable at times. Tr. 241.

Similarly, on June 21, 2000, Dr. Andrews wrote a letter

to United of Omaha Life Insurance Company and requested a continuation of McLarty's insurance coverage, stating –

> [McLarty] is an unlikely candidate to ever function independently primarily due to her cognitive impairment. Her mental impairment, both in terms of her mental status (mood primarily) and her personality immaturity should qualify her for a disability claim. Her judgment remains markedly impaired, both at home and at work. Tr. 240.

On June 5, 2002, treatment notes show that Dr. Andrews had quite a discussion with McLarty and her mother about McLarty's situation. Andrews noted that McLarty was previously denied disability "because of the opinion that she has the ability to work but lack of motivation is not usually considered a disability." Tr. 366. Andrews opined, however, that McLarty "may well have a psychiatric/psychological basis for a disability claim." Tr. 366. He stated that McLarty "ha[d] virtually a total lack of insight into what should be a role in society and is very content to be totally dependent on her parents to problem solve and provide for her." Tr. 366.

On May 28, 2003, Dr. Andrews noted McLarty's apparent weight gain due to her new "couch potato" lifestyle. Tr. 369.

He recognized that McLarty registered to take classes at Western Iowa Tech but did not attend regularly. Tr. 369. He noted that McLarty's mother was going to look into mental health counseling for McLarty. Andrews stated that it was "highly doubtful" that McLarty was employable due not only to her lack of motivation to think about employment, but also her lack of motivation to perform reasonably well in a job setting. Tr. 371.

On October 1, 2003, Dr. Andrews wrote a letter requesting McLarty's dismissal from jury duty because of her seizure disorder and her "mild to moderate memory impairment." Tr. 239.

On April 27, 2004, Dr. Andrews recognized that McLarty had started seeing a mental health counselor and that he believed she should continue seeing the counselor. Tr. 375. He again noted McLarty's lack of motivation to find employment as well as her "narcissistic" viewpoint of the world and her role in it. Tr. 372, 375.

In a May 7, 2004, letter to McLarty's family physician, Dr. Andrews noted that McLarty lost her grant at the community college because of poor performance, and that "motivation is

still a big problem for her." Tr. 238. Vocationally, Dr. Andrews stated that McLarty did not have significant opportunities for improvement because she was "not very well motivated for any kind of job performance." Tr. 238.

Dr. Andrews' notes relating to McLarty's 2005 and 2006 appointments similarly recognize McLarty's failure to do well in school and her lack of any motivation for employment or her ability to perform employment. Andrews further opined that McLarty had no idea of how to control herself and the events of her life in a healthy and productive way. Tr. 376-378. Andrews recognized that McLarty continued to display "extremely bizarre behavior intermittently" in her life, and that her Zoloft treatments, which initially had a decent affect on McLarty's mood stability, had begun to wane. Tr. 380.

On May 7, 2007, Dr. Andrews opined, as he did numerous times in the past, that McLarty should qualify for disability. Andrews stated: "Her continued bad choices, her immature personality and her near total lack of motivation and understanding of the consequences of her actions underlies her disability problem." Tr. 383. Andrews once again recognized

McLarty's complete reliance on her parents and her inability to understand the significance of the limits her parents had set on her, as she spent most of her time denying her actions or the consequences of her choices. Tr. 385. Andrews stated, "[a]gain, it is my opinion that she is totally disabled but not on a physical basis." Tr. 385.

In a residual functional capacity assessment treating source statement dated February 1, 2007, which assessed McLarty's impairments as of 2001, Dr. Andrews listed McLarty's diagnoses in part as epilepsy and cognitive impairment. Tr. 358. In the assessment, Andrews noted that McLarty's seizures were well controlled with medication, but that McLarty suffered from associated mental problems including depression, irritability, short attention span, memory problems, and behavior extremes. Tr. 361. As a result, Andrews stated that McLarty had good days and bad days, and would need to take one to two unscheduled breaks during an eight-hour work day. Tr. 361. Furthermore, Andrews stated that McLarty would likely miss work more than four times per month as a result of her impairments. Tr. 361. As mentioned, Andrews concluded that the functional limitations set out in the treating source

statement existed at that degree since 2001.  Tr. 362.

### 2.  Treatment at Siouxland Mental Health Center

McLarty eventually sought treatment for her ongoing depression and anxiety problems at the Siouxland Mental Health Center in 2004.  McLarty's intake assessment report, dated April 15, 2004, diagnosed her in part with "major depressive disorder, recurrent, mild," and "dependent personality traits."  Tr. 282.

McLarty attended therapy sessions at Siouxland Mental Health on a weekly or semimonthly basis.  Some of the topics often discussed in these sessions included school, her obsessions with an actor who starred in the Lord of the Rings movies, her interests in writing, her relationship with her family and others, her prior jobs, and her activities at home. Tr. 256-265, 269-273, 276-278.  McLarty's first therapist, Michelle Buhman-Livermore, often cited McLarty as "delusional" regarding her obsessions with the Lord of the Rings actor, "Dom."  Therapist Livermore focused numerous times on McLarty's delusional and fantasy thoughts of meeting and marrying Dom, once stating in her report, "you do not get a sense of her skewed thinking until she begins to tell you

about her fantasy of Dom." Tr. 262. On several occasions, McLarty believed she was receiving e-mails from Dom and referred to him as her boyfriend. Tr. 261-265. Livermore mentioned numerous times that McLarty was an extremely immature woman and was dependent on her parents. Tr. 271-273. Livermore also stated that McLarty's "plans for her future do not seem realistic and are the plans one might expect a teenager to have." Tr. 273. Livermore often cited McLarty's moods as pleasant and cooperative, but also stated numerous times that she was anxious (Tr. 276, 277), quiet (Tr. 278), or that she continued to struggle with her mental illness and personality issues. Tr. 256.

In a February 6, 2006, Medical Source Statement, which assessed McLarty's impairments as of January 2004, Livermore found that McLarty was "seriously" impaired in many areas regarding her ability to perform unskilled work. These areas included the ability "to sustain ordinary routine without special supervision," "to make simple work-related decisions," "to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length

of rest periods...," "to ask simple questions or request assistance," "to accept instructions and respond to criticism from supervisors," "to get along with co-workers or peers...," and "to respond appropriately to changes in a routine work setting." Tr. 252. In explaining her assessment, Livermore stated the following: "I would be concerned that her depression and suicidal thoughts would limit her. Criticism is extremely difficult for her. There is a strong discrepancy between mental age and chronological age. Behaves more as a pre-teen than adult. Needs much structure support..." Tr. 252. The report also stated that McLarty suffered marked impairment in maintaining social functioning, and "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner." Tr. 255. Finally, the report noted that there were repeated "past episodes of deterioration or decompensation in work or work-like settings which cause[d] [McLarty] to withdraw from that situation or to experience exacerbation of signs and symptoms." Tr. 255. As mentioned, Livermore stated that McLarty's conditions existed and persisted since at least January 2004. Tr. 252.

McLarty underwent a psychiatric evaluation with Laurie Warren, a physician's assistant at Siouxland Mental Health Center. On July 13, 2004, Warren diagnosed McLarty with Depressive Disorder with Dependent Personality Traits and Epilepsy (controlled by Tegretol medication), with a GAF of 65. Tr. 267. Warren prescribed Zoloft for McLarty's depressive symptoms. Tr. 268. As a result of the Zoloft, McLarty stated that she would become tired and sleep for an hour or so during the day. Tr. 417.

On August 16, 2004, Warren noted McLarty's obsession with "Dom" and McLarty's concerns about the effect of the Zoloft medication on her seizure disorder. Tr. 259. Warren reported McLarty's mood as being a five or six on a scale of one to ten. Warren reported McLarty's mood as depressed and anxious, and that her thought content was delusional. Tr. 259.

In a March 6, 2006, progress note, Warren stated that "patient reports that she is doing good. Things at home are really good. Patient still isn't working and is still waiting for disability." Tr. 319. Several other progress notes reported McLarty as "doing good," though others provided that McLarty reported having had anxiety attacks. Tr. 321, 323.

McLarty saw therapist Bobbi Meister from March 15, 2006, through August 24, 2006.[5]   Tr. 326-339.   These records indicate similar problems with McLarty as discussed by Livermore, in that her moods varied from happy to anxious to sad.

It appears from the record that McLarty was nowhere near as open about her condition and problems with Meister as she was with Livermore.   At the ALJ hearing, McLarty testified about her relationship with both Livermore and Meister.   Tr. 413.   McLarty stated that Livermore was the one person, other than McLarty's mother, who knew more about McLarty and how her mental impairments affected her than anyone else.   Tr. 414. McLarty testified that her relationship with Meister was less open than it was with Livermore, but was improving.   Tr. 414-15.

---

[5] The Court once again recognizes that some of the medical records with regard to Warren, Meister, Livermore, and Dr. Andrews are from after McLarty's date last insured.   Thus, these records were not considered as a basis for the Court's consideration of McLarty's disability.   As mentioned, however, these records are relevant to show the severity of McLarty's impairments prior to the expiration of her insured status, which the record substantially supports.   See Parsons, 739 F.2d at 1340; Basinger, 725 F.2d at 1169.

### 3. Consultative Examiner, Dr. Michael Baker

On August 2, 2004, shortly before her last eligibility date, McLarty saw Dr. Michael Baker for a psychological consultative examination. Tr. 246-249. Baker diagnosed McLarty with depressive disorder with dependent features and a GAF of 60. Tr. 249. Baker reported that McLarty's anxiety seemed to interfere with her ability to concentrate, "with a slower cognitive pace that might limit work-related activities." Tr. 248. The report stated that social interactions increased McLarty's anxiety. Tr. 248. The report also provided that McLarty "would seem able to remember and understand instructions, procedures and locations adequately." Tr. 248. Baker stated that McLarty did "not appear to suffer from major depressive symptoms," but that she "ha[d] poor energy and problems with sense of worthlessness and helplessness." Tr. 248.

### C. ALJ Hearing - Vocational Expert Testimony

In the ALJ's first question for the vocational expert ("VE"), the ALJ set forth standards based on unskilled work with seizure precautions. The ALJ stated that McLarty could not work on ladders, ropes, scaffolds, etc., and that she had

a "functional capacity for [specific vocational preparation] 1 or 2 work only, simple, routine, repetitive work that does not require her to set goals or deal with job changes, work that can be performed with ordinary, not special, supervision." Tr. 424. The ALJ continued, "from a social standpoint, I would like to say she can handle brief or superficial social interaction, but not a job where she's required to have frequent or constant social interaction during the day with coworkers or the general public or supervisors." Tr. 424. She then asked the VE whether McLarty could return to any of her past unskilled jobs based on that functional capacity. Tr. 424. The VE stated that McLarty could work as a household cleaner.[6] Tr. 424-25. Regarding other potential jobs, the VE testified that McLarty could work as a mail clerk or perform assembly or hand packing jobs. Tr. 426, 427. The VE stated that the majority of jobs in the light or sedentary category were feasible. Tr. 427.

---

[6] The ALJ proceeded to ask McLarty about her job at Comfort Inn, and subsequently determined that she would not consider her job at Comfort Inn a past unskilled job. Tr. 425. She then asked the VE whether he believed she could clean as a step five job, and the VE answered affirmatively. Tr. 425.

The ALJ then asked the VE whether he believed McLarty could do the type of employment he identified based on McLarty's testimony. Tr. 428. The VE stated that he'd "question whether anything would be feasible." Tr. 428. The VE further stated:

> [c]ertainly one would have to be able to get to work on a more consistent basis than a week. And certainly working during – or sleeping during the workday is not consistent with normal employment and would not be tolerated ... in the normal course of employment by the average employer. Tr. 428.

McLarty's representative asked the VE whether McLarty could perform in any competitive employment if the VE applied both therapists' limitations to his analysis; specifically, "the ability to complete a normal work day and work week without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods." Tr. 428-29. The VE responded "definitely not," and that somebody like that could not complete a normal work week without special supervision or "without taking an unreasonable number of length of rest

breaks."[7]  Tr. 429.

**D.  The ALJ's Decision**

In the ALJ's decision of December 7, 2006, the ALJ determined at step one that McLarty did not engage in substantial gainful activity from her alleged onset date of December 1, 2001, through her last date of insured.  Tr. 22. At step two, the ALJ determined that McLarty had severe impairments of depression with dependent features and epilepsy.  Tr. 22.  At step three, the ALJ found that McLarty did not have an impairment that fell under one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 23.  At step four, the ALJ determined that McLarty was unable to perform past relevant work because of her restrictions as an unskilled worker and because she was limited to less than frequent contact with the public.  Tr. 29.  The ALJ found that McLarty's residual functional capacity was as follows:

> ... through the date last insured, the claimant had no exertional limitations.

_____

[7] The Court understands this quote to mean that McLarty could not complete a normal work week without taking an unreasonable number of breaks, each break lasting an unreasonable length of time.

> However, due to her epilepsy, she must take
> seizure precautions, i.e., she is precluded
> from climbing ladders, ropes, and
> scaffolds; and she is precluded from
> working around hazards, such as machinery
> and heights; and she should not work around
> open bodies of water or drive a vehicle.
> Due to her mental impairment, the claimant
> is restricted to unskilled work (SVP 1 or
> 2) which is simple, routine, and
> repetitive; with no requirement to set ...
> realistic goals or deal with job changes.
> She can work with ordinary, not special
> supervision; she can work with brief,
> superficial social interaction, but not
> frequent or constant social interaction,
> during the day with coworkers or the
> general public or supervisors.

Tr. 24.

In determining McLarty's residual functional capacity, the ALJ found that McLarty's "medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." Tr. 25. In arriving at this conclusion, the ALJ noted that McLarty testified she was not working because she was trying to receive disability. Tr. 24-25. The ALJ also stated that McLarty testified she could perform a job where she cleans. Tr. 25. The ALJ further supported her conclusion by analyzing

21

McLarty's medical history, noting a progress report issued by her therapist which stated generally that McLarty wanted to exercise every day and was feeling good about herself. Tr. 25. The ALJ further noted that the consultative examiner, Dr. Baker, opined that McLarty did not seem to suffer from major depressive symptoms, but rather she had energy problems and a feeling of worthlessness and helplessness. Tr. 26. Finally, the ALJ noted Dr. Andrews' statements regarding her lack of motivation for any kind of job performance. Tr. 26.

In assessing McLarty's credibility, the ALJ determined that McLarty's daily activities were inconsistent with her disability allegations, which raised doubts of her motivation to work. Tr. 26, 27. The ALJ pointed to McLarty's daily activities of staying at home, playing poker and solitaire, and napping, as well as McLarty's 2.0 GPA at Western Iowa Tech,[8] and opined that these factors were indicative of someone who had the ability to concentrate and who could "apply herself and accomplish goals and tasks without

_____

[8] The record shows, at Tr. 70, that McLarty's cumulative GPA at Western Iowa Tech was 1.42. The ALJ relied on McLarty's testimony, in which McLarty stated her GPA was approximately 2.0. As mentioned, a 1.42 GPA represents a D+. http://www.witcc.edu/pdf/catalog.pdf, visited May 20, 2009.

difficulty." Tr. 27. The ALJ also noted that McLarty enlisted in psychotherapy sessions just one month prior to applying for disability in May 2004, and that McLarty's onset date of December 1, 2001, had no support in the record except that her last employment ceased on this date. Tr. 27.

Moreover, the ALJ assigned "most weight" to the consultative examiner's assessment, and "[did] not afford greatest weight[9] to Dr. Andrews' opinion with respect to [McLarty's] ability to work" because Dr. Andrews saw McLarty only "occasionally." Tr. 27, 28. The ALJ also did not assign significant weight to opinions of McLarty's social workers, Livermore and Meister, because they were not "acceptable medical sources." Tr. 28. However, in evaluating their opinions, the ALJ noted that Livermore's assessment of McLarty's difficulties in maintaining social functioning and her marked difficulties in maintaining concentration, persistence, and pace, were inconsistent with McLarty's references to her friendships and her activities on the internet. Tr. 28. The ALJ made similar findings with regard

---

[9] The Court understands "greatest weight" to be similar to "significant weight."

to Meister's opinions.  Tr. 28.  Finally, the ALJ stated that her findings as to McLarty's residual functional capacity were consistent with opinion evidence submitted by State Agency medical consultants.  Tr. 28.

At step five, the ALJ found that McLarty was capable of working the majority of sedentary and light jobs, including work as a housekeeper/cleaner or other similarly classified occupations.  Tr. 30.

## II. DISCUSSION

> Our role on review is to determine if the Commissioner's findings are supported by substantial evidence on the record as a whole.  Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion.  Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006).  In considering the evidence, we must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006).  We will disturb the ALJ's decision only if it falls outside the available "zone of choice."  Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006).  An ALJ's decision is not outside the "zone of choice" simply because we might have reached a different conclusion had we been the initial finder of fact. Id.  Consequently, we may not reverse the decision to deny benefits unless the record

> contains insufficient evidence to support
> the outcome. <u>Culbertson v. Shalala</u>, 30
> F.3d 934, 939 (8th Cir. 1994).

<u>Nicola v. Astrue</u>, 480 F.3d 885, 886-87 (8th Cir. 2007).

"In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136-37 (8th Cir. 1998) (citing <u>Brinker v. Weinberger</u>, 522 F.2d 13, 16 (8th Cir. 1975)). <u>See also</u> <u>Patrick v. Barnhart</u>, 323 F.3d 592, 595 (8th Cir. 2003).

In a Social Security disability case, the claimant bears the burden to prove that she has not worked since the alleged onset of disability date because of one or more severe impairments. If the impairments are not severe enough to qualify for benefits at the third step of the sequential evaluation, the claimant must show the inability to perform past relevant work. Although the ALJ determines the claimant's residual functional capacity at the fourth step, the burden shifts to the Commissioner at the fifth and final step of the sequential evaluation to show the existence of jobs that can be performed given the claimant's age, education, past relevant work, and residual functional

capacity.

In this case, McLarty argues that the ALJ committed numerous errors in her decision. First, McLarty argues that the ALJ erred because there was not substantial evidence in the record to support the ALJ's assessment of McLarty's residual functional capacity. McLarty maintains that the ALJ took statements from her testimony out of context to show that she lived an active life, when she was actually very sheltered. McLarty also argues that the ALJ did not give appropriate weight or give any explanation as to why she did not give appropriate weight to the treating source opinions of Dr. Andrews as well as McLarty's therapists, Livermore and Meister. McLarty contended that the ALJ relied solely on the opinions of non-treating, non-examining physicians and that the ALJ attempted to use her own medical knowledge in evaluating McLarty's credibility.

After careful review of the administrative record and for the reasons set forth herein, this Court is persuaded that the ALJ erred in disregarding the opinions of Dr. Andrews and therapists Livermore and Meister. Substantial evidence shows that McLarty suffered from severe and disabling depression and

cognitive impairments as set forth herein. Moreover, the ALJ erred at step five in finding that McLarty could perform other work in the national economy.

**A.    The ALJ Erred in Disregarding the Opinions of Dr. Andrews and Therapists Livermore and Meister**

In the ALJ's decision, the ALJ determined that the opinions of Dr. Andrews and therapists Livermore and Meister were not to be afforded significant weight.  The ALJ reasoned that Dr. Andrews only examined McLarty "occasionally" and that Livermore and Meister were not "acceptable medical sources" as defined by 20 C.F.R. 404.1513(a).  In evaluating Livermore's and Meister's opinions regarding McLarty's impairments, however, the ALJ determined that they were inconsistent with their treatment notes in the record.

The Court is persuaded that the ALJ erred in not affording significant, if not controlling, weight to Dr. Andrews' opinions.  "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Furthermore, "[a] treating physician's opinion regarding an applicant's impairment will be granted controlling weight,

provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Id. As discussed herein, the record in this case provides substantial evidence supporting a finding of severe cognitive impairments of a learning disability and borderline intellectual functioning, as well as depression and anxiety. The ALJ stated that Andrews saw McLarty only "occasionally"; however, records submitted to and accepted by the Appeals Council, and thus made a part of the administrative record,[10] show that Dr. Andrews saw McLarty for her seizure condition and her cognitive impairment annually from 1991 through the date of the ALJ's decision and beyond. Tr. 357, 383. Treatment notes included in the record show that Andrews thoroughly examined and interviewed McLarty at these

---

[10] See Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992) (Newly submitted evidence to the Appeals Council becomes a part of the administrative record "even though the evidence was not originally included in the ALJ's record." "If ... the Appeals Council considers new evidence but declines to review the case, we review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision.") (citing Browning v. Sullivan, 958 F.2d 817, 823 n.4 (8th Cir. 1992)).

appointments. Records from these appointments, specifically those from 2000 through McLarty's date last insured in 2004, provide sufficient evidence of McLarty's cognitive impairments and her immature and delusional view of her role in society. The ALJ erred in neither considering nor giving significant, if not controlling, weight to Dr. Andrews' opinions.

The ALJ also failed to give any weight to the opinions of Livermore and Meister, reasoning that the two were not acceptable medical sources and that their opinions were inconsistent with their treatment notes. While Livermore and Meister may not be "acceptable medical source(s)" under 20 C.F.R. § 404.1513(a), their opinions constitute "other" medical sources under § 404.1513(d)(1). <u>See also</u> <u>Shontos v. Barnhart</u>, 328 F.3d 418, 425-26 (8th Cir. 2003). As the Eighth Circuit has explained, therapists such as Livermore and Meister are "appropriate sources of evidence regarding the severity of a claimant's impairment, and the effect of the impairment on a claimant's ability to work." <u>Shontos</u>, 328 F.3d at 426. In <u>Shontos</u>, the Eighth Circuit appeared to afford great weight to the claimant's therapists even though they were not "acceptable medical sources." The court

reasoned that the claimant was treated at a mental health center under a team approach, and that the opinions of the therapists who had a long-standing relationship with the claimant were consistent with the opinions of the treating psychologist.  Id.

In this case, the Commissioner argued that Shontos is distinguishable from the facts of this case because the ALJ must have found Livermore and Meister's opinions inconsistent with Warren's.  This Court is persuaded, however, that substantial evidence in the record shows that the opinions of Livermore, Meister, and Warren were not inconsistent, and further shows that McLarty suffered from severe cognitive impairments, depression, and anxiety problems.  The ALJ opined that Warren's notes were decisively in favor of a finding that McLarty suffered few problems; however, the record shows on several occasions that Warren noted that McLarty was delusional and showed signs of depression and anxiety, and further recognized that McLarty reported having anxiety attacks.  Tr. 259, 321, 323.  The ALJ also pointed to numerous places in the record where McLarty reported she was doing well and not having problems.  One reasonable explanation for this,

which the record fully supports, is that McLarty is quite defensive about any criticism or problems she may be suffering. McLarty saw Warren on several occasions for brief durations, so it is reasonable to assume that she would not have discussed or admitted the severity or extent of her problems until she felt more comfortable with Warren. However, the record when viewed as a whole substantially supports a finding that therapists Livermore and Meister, along with Warren, treated McLarty under a team approach at Siouxland Mental Health Center, and that these records were consistent. The ALJ erred in not affording more weight to these records and the opinions of Livermore, Meister, and Warren.

The ALJ further erred in assigning the most weight to the opinion of the consultative physician, Dr. Baker, who examined McLarty only once, as well as the opinions of State Agency medical consultants. "[T]he report of a consulting physician who examined the claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." Hancock v. Secretary of Dept. of Health, Ed. and

<u>Welfare</u>, 603 F.2d 739, 740 (8th Cir. 1979).  In this case, the reports of Dr. Andrews as well as the records from Siouxland Mental Health show that McLarty suffered severe impairments which prevented her from being able to work.  Thus, the opinion of Dr. Baker and the State Agency medical consultants did not constitute substantial evidence in this case.

**B.  Substantial Evidence in the Record Shows that McLarty Suffered From Severe Cognitive Impairments.**

The ALJ determined that McLarty did not suffer from severe cognitive impairments of a learning disability and borderline intellectual functioning.  In doing so, the ALJ reasoned that McLarty's subjective complaints were not credible.  The ALJ further proceeded to substitute her own medical opinions to contradict the opinions of Dr. Andrews and the Siouxland Mental Health professionals.  The ALJ pointed to numerous parts of the record that discussed McLarty's lack of motivation to find work.  The record shows, however, that McLarty has in the past attempted to apply for positions, but that she either had a panic attack while applying or, if she could complete the application, was denied an interview.  The record further shows that any lack of motivation by McLarty to

find employment is due to her impairments and is not because she is lazy.

The ALJ also stated that McLarty's daily activities of staying at home, playing poker and solitaire, and napping, along with McLarty's education at Western Iowa Tech, indicated that she had the ability to concentrate, apply herself, and accomplish goals without difficulty. The record shows, however, that McLarty's abilities were far more restricted than the ALJ concluded.

In a letter submitted after the ALJ issued her decision, McLarty's parents shed light on McLarty's impairments as well as her typical daily activities.[11] Mr. and Mrs. McLarty stated that McLarty did not play poker every day to the extent testified; rather, she played games on a free web site, which included poker, solitaire, and a dart game popping balloons. Tr. 341. The letter states that McLarty told her mother that

---

[11] Once again, the Court notes that much of the letter discusses incidents which occurred after McLarty's date last insured. The Court is not using this information or any information in the record which post-dates McLarty's date last insured as a basis for its finding of disability; rather, this information reflects the high severity of McLarty's impairments that also existed at all times prior to her date last insured and under the Court's consideration in this case.

she could not identify a winning poker hand, but that the game informed her whether she had won the hand. Tr. 341. Her parents further wrote about McLarty's struggles with employment and that she was fired from or that she walked out on numerous jobs. Tr. 341-343. Her parents noted that vocational rehabilitative services found McLarty to be significantly disabled, but that they did not assist her at the time since they were working with "most disabled" individuals. Tr. 341. Her parents noted that McLarty used to hide in a closet, kick in her walls, or throw her television when she would have to go to work. Tr. 342. At one point, McLarty scrubbed her glasses with a S.O.S. pad, apparently believing the pad would clean the lenses. Tr. 343. Moreover, as a sign of McLarty's financial irresponsibility and cognitive impairments, she once obtained a credit card based on her parents' credit and made a series of unexplainable purchases. One noteworthy purchase was a charge for $200.00 in DVD videos at K-Mart, which she then immediately sold back to a music store in the mall for $36.00 in cash. Tr. 344, 345. Her parents stated that McLarty was pleased with herself that she was able to bring home $36.00 in cash. Tr. 345. Her

parents further noted that McLarty still enjoyed playing with her Barbie dolls at age 28. Tr. 345. Mr. and Mrs. McLarty wrote that they did not know how McLarty could ever support herself due to her impairments and difficulties with comprehending things. Tr. 346.

The records cited above relating to McLarty's treatment from Andrews, Livermore and Meister, as well as her academic record, immaturity, and dependence on her parents, further show that McLarty suffered severe cognitive impairments. As mentioned, McLarty was designated as learning disabled and enrolled in special education math classes through high school. She graduated from high school with a 1.69 GPA. Tr. 71. McLarty enrolled in community college courses, but quit after several semesters with a cumulative 1.42 GPA. Tr. 70. As the ALJ noted in her decision, McLarty was assessed a full scale IQ of 102 in 1992. However, in 2002, McLarty was assessed a full scale IQ of 76 under the Wechsler Intelligence Scale for Children III, which represents borderline intellectual functioning. This Court is persuaded that the latter score is more in line with her academic history and the other evidence in the record.

Substantial evidence in the record shows that McLarty's thought process and understanding of her role in society is similar to that of a teenager or even a pre-teen. See, e.g., Tr. 252, 273. Records of her therapy sessions often dwelled on her fantasy and delusional obsessions with "Dom" from Lord of the Rings, in that she called him her boyfriend and believed she was receiving e-mails from him. Tr. 261-265. The Court is therefore persuaded that the substantial evidence in the record supports a finding that McLarty's cognitive impairments, along with her depression and anxiety, were severe and disabling prior to her last date of eligibility of September 30, 2004.

**C. The ALJ Erred in Finding that McLarty Could Perform Other Jobs in the National Economy**

The ALJ found at step five that McLarty could perform other work in the national economy; specifically, the ALJ found, based on her residual functional capacity assessment and the VE's testimony, that McLarty could perform the majority of sedentary and light jobs, including work as a housekeeper/cleaner or other similarly classified occupations. Tr. 30. The Court is persuaded that the ALJ's residual

functional capacity finding and hypothetical question upon which she relied did not encompass all of McLarty's impairments, including McLarty's severe cognitive impairments and anxiety problems associated with work. A VE's testimony constitutes substantial evidence only when it is based on a properly phrased hypothetical question which encompasses all of the claimant's impairments. <u>Pickney v. Chater</u>, 96 F.3d 294, 296 (8th Cir. 1996). The ALJ erred by not including these impairments in the hypothetical question posed to the VE.

The ALJ noted that McLarty admitted she was not working because she was waiting on disability, and that she could work as a cleaner if she needed to find a job. In this Court's thirty years on the bench, there has never been a claimant who has made such an admission. However, the Court disagrees with the ALJ that McLarty could therefore actually work. First, McLarty unsuccessfully worked as a housekeeper at the Comfort Inn until she had an anxiety attack while cleaning a bathroom. This alone shows she is unable to perform the tasks of a cleaner. Furthermore, due to her cognitive impairments, McLarty does not understand the significance of her statement

and that it does not help her.  This shows that McLarty cannot be considered as normal-functioning and not impaired.

Even if McLarty actually believed she could return to work, and assuming she could find a job, the Court is persuaded that she would suffer the same disabling problems and would not be able to keep a job for any significant period of time.  To determine whether a claimant can perform other jobs in the national economy, the Secretary must consider whether the claimant can actually find and hold a job in the real world.  Parsons, 739 F.2d at 1340.  As mentioned, McLarty has a history of failed attempts at both obtaining and maintaining employment.  This is no doubt due to her impairments, which she has suffered for quite some time.

Moreover, substantial evidence in the record shows that McLarty could not perform any job on a full-time basis.  Under Social Security Ruling (SSR) 96-8p, a person's residual functional capacity must be evaluated based upon work performed on a regular and continuing basis, which means eight hours a day for five days a week or an equivalent work schedule.  The Commissioner's position is that, "at step five of the disability determination, 'only an ability [on the part

of the claimant] to do full-time work will permit the ALJ to render a decision of not disabled.'" <u>Bladow v. Apfel</u>, 205 F.3d 356, 359 (8th Cir. 2000).  In Dr. Andrews' residual functional capacity assessment treating source statement, he found that McLarty would need to take one to two unscheduled breaks during an eight-hour work day.  Tr. 361.  Furthermore, Andrews stated that McLarty would likely miss work more than four times per month as a result of her impairments.  Tr. 361. McLarty's therapist, Livermore, stated in the medical source statement that McLarty's impairments caused repeated "past episodes of deterioration or decompensation in work or work-like settings which cause[d] [McLarty] to withdraw from that situation or to experience exacerbation of signs and symptoms."  Tr. 255.  These limitations would prevent McLarty from working at any job on a full-time basis.

The Court is persuaded that the hypothetical presented to the VE by McLarty's representative is more appropriate in this case.  There, the VE responded that based on the opinions of the therapists, McLarty could "definitely not" perform competitive employment, and that somebody like that could not complete a normal work week without special supervision or

"without taking an unreasonable number of length of rest breaks." Tr. 429.

**D.    Onset Date**

McLarty alleges an onset date of December 1, 2001, which represents the last day she was employed. The Court has considered this date along with McLarty's work history and the medical evidence in the record. While there is medical evidence supporting a finding of McLarty's cognitive impairments over the span of her entire life, the medical evidence in the record surrounding McLarty's depression and anxiety supports a finding of disability at the time she sought treatment for these conditions in 2004. The Court is therefore persuaded that the onset date in this case is April 15, 2004, the date of her intake assessment at Siouxland Mental Health Center. Tr. 279-282. The evidence in the record substantially supports a finding that as of this date, McLarty's depression and anxiety combined with her cognitive impairments of a learning disability and borderline intellectual functioning left her disabled.

**III.    CONCLUSION**

For the reasons stated herein, this Court is persuaded

that substantial evidence in the record does not support the ALJ's finding that McLarty was not disabled. Substantial evidence shows that McLarty met her burden of proving she was disabled under the Act prior to her date last insured, and that there are no jobs in the national economy she could perform. This Court is further persuaded that there is no need to remand to the Commissioner to take additional evidence. The record contains sufficient evidence to allow the Court to render this decision.

**IT IS THEREFORE HEREBY ORDERED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the ALJ is reversed, and the Commissioner is directed to compute and award disability benefits to McLarty with an onset date of April 15, 2004.

A timely application for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA"), must be filed within thirty (30) days of the entry of final judgment in this action. Thus, if this decision is not appealed, and McLarty's attorney wishes to apply for EAJA fees, he must do so within 30 days of the entry of the final judgment in this case.

**IT IS SO ORDERED** this 22nd day of May, 2009.

_Donald E. O'Brien_

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa